**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Tony SMITH and Kenneth L. Jordan,
Defendants-Appellants.**

**Nos. 85–1149, 85–1150.**

United States Court of Appeals,
Tenth Circuit.

April 3, 1986.

---

Charles Szekely (Michael G. Katz, Fed. Public Defender, with him on brief), Asst. Fed. Public Defender, Denver, Colo., for defendant-appellant Smith.

Tony Smith, pro se.

Kenneth N. Gordon, Denver, Colo., for defendant-appellant Jordan.

William G. Pharo, Asst. U.S. Atty. (Robert N. Miller, U.S. Atty. and Raymond P. Moore, Asst. U.S. Atty., on brief), Denver, Colo., for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, LOGAN, Circuit Judge, and BROWN,* Senior District Judge.

WESLEY E. BROWN, Senior District Judge.

Tony Smith and Kenneth Jordan were indicted, tried by a jury and convicted of armed robbery of a federally insured, State-chartered credit union in Denver, Colorado in violation of 18 U.S.C. Secs. 2113(a) and (h) and 18 U.S.C. Sec. 2. The district court sentenced each of the defendants to 25 years imprisonment and ordered each to make restitution in the amount of $100.29 to the credit union out of his personal funds. *See* 18 U.S.C. Sec. 2113(d). Both defendants have assigned numerous errors on appeal. Brevity will be served in the disposition of these appeals by joint treatment of their common objections. First, they claim that the court erred in denying their motion to dismiss the superseding indictment on the basis that it fails to allege an offense under 18 U.S.C. Secs. 2113(a) and (h). Second, they assert that the court abused its discretion in denying their motions for severance. Third, Smith contends that there was insufficient evidence to sustain the jury's verdict of guilty.[1] Fourth, Jordan argues that the court abused its discretion in denying his request for an additional continuance to attempt to locate an unidentified witness whom he claimed material to his defense. We find the de-

---

* Honorable Wesley E. Brown, United States Senior District Judge for the District of Kansas, sitting by designation.

1. Additionally, Smith requested leave to file a *pro se* supplemental brief on this issue. His request was granted on October 4, 1985. His January 24, 1986 motion to require his counsel to produce certain documents for his "use in evaluating the legality of his appeal heretofore" is denied.

fendants' arguments unpersuasive and affirm the judgment of the district court as to each of the defendants' conviction.

Viewing the evidence in the light most favorable to the Government in seeking to sustain the jury's verdicts, the evidence may be summarized as follows. On October 26, 1984, two armed black men robbed the Denver Public School Employees Credit Union in Denver, Colorado—a State-chartered credit union whose deposits were insured by the National Credit Union Administration. Both of the robbers' faces were covered by knit caps and scarves; only their eyes and part of their hands and legs were visible to the employees at the credit union. The robber with the light hue skin color forced the headteller at gunpoint to open the safe and took from her a metal cash box which contained approximately $11,000, in currency. He was described as wearing a black sweat shirt, a pair of black corduroy pants and glasses. The other darker skin robber with the shotgun, described as wearing a light beige color trench coat and a pair of sneakers, took money from the teller drawers in the lobby.

A Denver police officer who responded to the robbery alarm spotted these robbers as they were getting into their getaway car parked in front of the credit union. The officer chased the robbers' car, but he lost sight of it momentarily in the crowded neighborhood. A Hispanic male, whose identity remained unknown at the time of trial, came to the officer and advised him that he observed two men, one wearing clothing in white color and the other in black, had just left their car in an alley and fled on foot. This physical description of the suspects was verified almost simultaneously in a radio broadcast by the police dispatcher relaying the information given by the credit union employees to the detectives. The police immediately cordoned off the neighborhood. Moments later, the police found Jordan. At the time he was taken into custody, Jordan was wearing only shorts, socks and sneakers. Not far from where Jordan was arrested, the police found the getaway car, a knit cap, a pair of sweat pants, and a beige color trench coat

that contained $1,595 and an unused shotgun shell in its pockets. Inside the getaway car, the police found a loaded shotgun with its hammer in cocked position, a black velour jacket, several scarves, a knit cap and a wallet with several of Jordan's identification cards in it. The police recovered some money which was scattered on the ground near the getaway car.

The police continued the door-to-door search for the other suspect. Emuel Clark, a resident in the neighborhood that was being searched, told the police that he saw his dogs attack a black man in his backyard. Minutes later, the police found Smith hiding under a crawl space of a house near Clark's resident. There were injuries on his legs. At the time of his arrest, Smith was wearing a pair of black corduroy pants and had $155 in his pockets. The police found a metal cash box, a double-barreled derringer, and a pair of gloves in a shed nearby. Jordan's fingerprints were the only identifiable prints exhibited on the cash box.

The police brought the defendants back to the credit union for a show-up identification. Two of the credit union employees recognized that the clothing and physical attributes of the defendants were substantially similar to those who participated in the robbery thirty minutes earlier. At this show-up viewing and later during the trial, these two employees identified Smith as the light complected robber who displayed the derringer and Jordan as the darker one armed with the shotgun.

The Government on December 7, 1984 filed a superseding indictment, in which the grand jury charged:

On or about October 26, 1984, at Denver, in the State and District of Colorado, KENNETH L. JORDAN and TONY SMITH did, by force and violence and by intimidation, take from the person and presence of William J. Schwairy, Jr., and Alyce Y. Keys, approximately $14,470.07 which belonged to and was in the care, custody, control, management and possession of the Denver Public School Em-

ployees Credit Union, a State-chartered credit union the accounts of which were then and there insured by the National Credit Union Administration Board, formerly the Administrator of the National Credit Union Administration; and in the course of committing the above offense, KENNETH L. JORDAN, and TONY SMITH did assault and did put in jeopardy their lives and the lives of others by the use of dangerous weapons, namely, a shotgun and a handgun, all in violation of Title 18, U.S.C. Sections 2113(a) and (d) and Section 2.

Both before the trial and at the close of the Government's case, defendants moved to dismiss the superseding indictment for failure to state an offense under Section 2113, 18 U.S.C. The court denied their motions and submitted the case to the jury, whose verdict on each of the defendants was guilty as charged. Each defendant appeals from the judgment of conviction.

■ Defendants argue, as they did in the court below, that the superseding indictment fails to state a crime under Section 2113, 18 U.S.C. Defendants point out that Section 2113(a), 18 U.S.C., proscribes as a federal crime the robbery of a "credit union" which is defined in Subsection 2113(h) to mean "any Federal credit union and any State-chartered credit union the accounts of which are insured by the Administrator of the National Credit Union Administration." The fatal defect alleged by defendants is on the basis that it is not because the Government failed to plead and prove the accounts of the credit union were federally-insured—indeed the Government did so satisfactorily—but because Congress impliedly repealed Subsection 2113(h) by failing to substitute in that subsection the "Administrator" with a "Three-Member Board" as the title of the managerial body for the National Credit Union Administration when it was renamed in a 1978 amendment to Section 102 of the Federal Credit Act, 92 Stat. 3680, *codified as amended at* 12 U.S.C. Secs. 1752a(a) and (b) (1978). Under this view, defendants argue that since the

position of "Administrator" as expressed in Subsection 2113(h) has been abolished by 12 U.S.C. Secs. 1752a(a) and (b), this variance in the titles for the administrative body of the National Credit Union Administration is such that the state-chartered credit unions whose deposits are insured by and under the title of the National Credit Union Administration Board are not within the purview and protection of 18 U.S.C. Sec. 2113(a).

Subsection 2113(h) does not contain the current designation of title for the managers of the National Credit Union Administration (NCUA). There is, however, nothing in the express language of 12 U.S.C. secs. 1752a(a) and (b) or its legislative history to support the position postulated here by defendants. Congress amended various sections of the criminal code, Title 18, U.S.C., on October 19, 1970, to bring within its statutory ambit state-chartered credit unions whose accounts are insured by NCUA. Specifically, Section 8 of the amendment added insured credit unions to Subsections 2113(a) to (c), 18 U.S.C. These sections relate to bank robbery and incidental crimes against federally-chartered or -insured financial institutions. Pub.L. 91–468, Section 8(1) and (2), 84 Stat. 1071, October 19, 1970.[2] At that time, NCUA was managed by an "Administrator" and a "Board". Pub.L. 91–206, 84 Stat. 49, 12 U.S.C. Sec. 1752a(a) (1970). The Administrator was to act as the chief executive officer of the NCUA, and the Board was comprised of a "Chairman and one member from each of the Federal credit union regions," whose actual function was to act in an advisory capacity. *Id.*, at Secs. 1752a(a) and (b); S.Rep. No. 91–518, 91st Cong. 2d Sess. 2, *reprinted in* 1970 U.S.Code Cong. & Ad.News 2479, 2481–2483. To make its organizational structure consistent with that of the other independent regulatory agencies, Congress revamped the administrative body of NCUA in 1978 under Title V of the Financial Institutions Regulatory and Interest Rate Control Act of 1978. Publ.L. 95–630, Title V, Section 102 of the

---

**2.** *See also* amendments under this legislation to    Sections 657, 1006, 1014 of Title 18, U.S.C.

Federal Credit Union Act, 12 U.S.C. Sec. 1752a (1970), by consolidating the managerial function of the Administrator and the advisory board into the governing body of a "reconstituted Board." This Board, consisting of three Presidential appointees, is vested with the authority to manage the NCUA. The Chairman is responsible for implementing the policies and regulations adopted by the Board, 12 U.S.C. Secs. 1752a(a), (b) and (e); *see also* H.R.Rep. No. 95–1383, 95th Cong., 2d Sess. 46 *reprinted in* 1978 U.S.Cong. & Ad.News 9273, 9318. This reorganization in the governing personnel of NCUA was the only substantive change provided in Title V of the 1978 amendment. The name of the agency, the National Credit Union Administration,[3] has remained unchanged and its primary administrative function in the regulation of the participating member accounts continues. Indeed, Section 509 of Title V of the 1978 amendment specified that "(a)ll rules, regulations, policies, and procedures of the Administrator in effect on the date of enactment of this title shall remain in effect until amended, superseded, or repealed." Pub.L. 95–630, Section 509, 92 Stat. 3683, 12 U.S.C. Sec. 1752 note.

Although there is apparently a technical incongruity in the titles for the manager of the NCUA, we believe that Congress attaches no legal distinction in designating the agency manager's title as "Administrator" in Subsection 2113(h) of the criminal code while naming it under the auspices of the "Board" in Section 1752a(a), Title 12 U.S.C. of the Federal Credit Union act of 1978. It is clear that Congress intends the titles of "Administrator" and "Board" to be used interchangeably in referring to the administrative body of NCUA as it is evinced in the recent enactment of the Comprehensive Crime Control Act of 1984. *Compare* Pub.L. 98–473, Title II, Section 1107(a), 98 Stat. 2145, *codified as amended* at 18 U.S.C. Sec. 215 (1984) (Sec. 215(c)(1) " 'financial institution' means—(D) any

credit union the accounts of which are insured by the Administrator of the National Credit Union Administration") *with id.,* Section 1108(a), 98 Stat. 2147, *codified as amended at* 18 U.S.C. Sec. 1344 (1984) (Sec. 1344(b) " 'federally chartered or insured financial institution' means—(3) a credit union with accounts insured by the National Credit Union Board.")

We reject defendants' assertion that the superseding indictment upon which they were convicted was fatally defective for failure to state a federal offense under Section 2113, Title 18 U.S.C. It is quite plain from a review of the record that the Government's charge in the superseding indictment was unequivocal. The Government sought to prove and did prove satisfactorily with competent evidence that the defendants committed a felony proscribed in the indictment. There was federal jurisdiction because the deposit accounts of the Denver Public School Employees Credit Union were insured by the NCUA at the time of the robbery occurred. An indictment is constitutionally sufficient if the offense is alleged with a reasonable degree of clarity to show a violation of law, and enables the accused to know the nature and cause of the accusation against him and to plead an acquittal or conviction in bar of future prosecution for the same offense. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590, 620 (1974); *United States v. Salazar,* 720 F.2d 1482, 1486 (10th Cir.1983); *cert. denied,* —— U.S. ——, 105 U.S. 789, 83 L.Ed.2d 783 (1985). We are satisfied that the superseding indictment alleged a federal offense under Section 2113(a), Title 18 U.S.C., and adequately apprised the defendants of the charge against them which they were required to defend.

Defendants' second argument is based on an assertion that the court erred in refusing to grant each of their pretrial requests for a separate trial because their

---

**3.** Pub.L. 95–630, Title XVIII, Section 1804, 92 Stat. 3723, *as condified at* 18 U.S.C. Sec. 709 (1978), added the "National Credit Union Board" as an adjunct title to the "National Cred-

it Union Administration" defined under the Federal Credit Union Act, 12 U.S.C. Secs. 1752 *et seq.*

theories of defense were antagonistic and "mutually exclusive." Each of the defendants alleged in these pre-trial motions for severance and that he was an innocent bystander in the vicinity of the robbery and that the co-defendant was one of the actual robbers and the second participant was never apprehended. They argued to the court that the acceptance of one of the defendants' defense theories would preclude a finding of acquittal of the other by the jury. The court denied their motions for severance. Defendants neither chose to testify nor did they attempt to implicate each other in the examination of the Government witnesses during the trial. It was only during the closing arguments to the jury that each of defendants' counsel maintained his client did not participate in the robbery. Counsel for Smith remarked that "there is no doubt in my mind that they have the right man (meaning Jordan) at the other side of the counsel table." Counsel for Jordan, in turn, attempted to cast the guilt on Smith in his remarks to the jury that Smith was one of the robbers who wore the light color clothing and the other one escaped. In the court's instructions to the jury, it charged that statements and arguments of counsel, unless made as an admission or stipulation of fact, were not evidence in the case.

The law in reviewing a claim for improper denial of severance motion in a criminal trial is well established in this Circuit. *See United States v. McClure*, 734 F.2d 484, 487–491 (10th Cir.1984) and *United States v. Petersen*, 611 F.2d 1313, 1331–1332 (10th Cir.1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980). It is sufficient to say that the standard for reversing a trial court's ruling in denying a severance motion requires a defendant to satisfy the "heavy burden of showing real prejudice to his case" resulting from a joint-trial. *Petersen, supra* at 1331. Neither a mere claim of conflicting defense theories nor an attempt by one defendant to cast blame on the other is adequate for a showing of actual prejudice which requires a granting of separate trials. *McClure, supra* at 488. We have, however, suggest-

ed that *"irreconcilable defenses* may require that defendants be tried separately." *Id.*, (emphasis in original). To sustain a claim of error under this theory, a defendant must make a factual demonstration, not an abstract allegation, that "the acceptance of one party's defense would tend to preclude the acquittal of other," or that "(c)onversely, such a showing would seemingly require that the guilt of one defendant tends to establish the innocence of the other." *Id.*, n. 1.

■ Our careful review of the record does not support a claim, and defendants have not convincingly demonstrated a factual basis that actual prejudice resulted from a joint trial of the defendants. The jury could have chosen to believe both defendants' contentions that they were innocent bystanders and that the real robbers escaped. But neither Smith's nor Jordan's theory of defense was supported by any competent evidence. There is no basis to conclude that an acceptance of one party's defense would preclude the jury from returning an acquittal of the other, or that a finding of guilty of one defendant would require an inescapable determination of innocence of the other. The cross-accusations occurred during closing arguments. The court properly instructed the jury that counsel's comments in opening and closing statements were not evidence and that it should consider the evidence adduced during the trial only against the defendant to whom it related. We conclude that there is no factual basis for finding an actual prejudice which would require us to hold the trial judge abused his discretion in denying the requests for severance.

■ Smith's third contention is that there was insufficient evidence to support the jury's verdict of guilty. Smith argues that the only circumstantial evidence connecting him to the robbery was that he was found hiding in a place near the getaway car and had $150 in currency in his pockets. He points out that the testimony of the head-teller indicated that the robber with the derringer who took the cash box from

her did not wear gloves. His fingerprints, however, were not found on the metal cash box or on the derringer which was recovered later by the police. In reviewing a claim of insufficient evidence to support a conviction by a jury, the standard is that we look at the evidence in the light most favorable to the Government. Circumstantial evidence is entitled to the same weight as that given to direct evidence in determining the issue of factual sufficiency to support a verdict beyond a reasonable doubt. We are satisfied from a review of the entire record that "*any* rational trier of fact could have found the essential elements of crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1970) (emphasis in original).

█ The last claim of error is assigned by Jordan. He argues that the trial court abused its discretion in refusing to grant an additional continuance of the trial. He claims that his request was necessary for locating an unidentified witness whom he claimed to be crucial to his case. Prior to trial, the Government turned over a copy of an audio tape which contained recordings of radio transmissions of the officers made during their pursuit of the getaway car. Counsel did not listen to both sides of the tape, thinking the side on which the audio portion did not start at the beginning of the tape was blank. On the morning of the first day of the trial, counsel for defendants learned that on the side of the tape which they had believed blank contained additional police radio messages and conversations about an unidentified Spanish-American whose observations of the fleeing suspects directed the officers to the arrest of Jordan. Jordan requested the court for a one day continuance to listen to the tape. The court granted Jordan's request. When the trial resumed, Jordan requested the court to continue the trial until he could locate the unidentified Spanish-American witness. The court denied the motion. Jordan has conceded that it "is possible that it would be impossible to find this crucial witness." Nevertheless, he argues that the court abused its discretion in denying his request for an open-ended continuance. The decision on whether to grant a continuance is a matter for the sound discretion of the trial court and will not be disturbed on appeal absent a showing of abuse resulting in manifest injustice. *United States v. Olivas*, 558 F.2d 1366, 1368 (10th Cir.), *cert. denied*, 434 U.S. 866, 98 S.Ct. 203, 54 L.Ed.2d 142 (1977). The trial of this case had already been continued once. It is undisputed that the identity of this Spanish-American was unknown to both the Government and the defense. Jordan's second request for an additional continuance to attempt to find this witness was clearly unreasonable. The trial court did not abuse its discretion in denying Jordan's request for an additional open-ended continuance.

The judgment of conviction as to each defendant is AFFIRMED.