STATE of Missouri, Respondent,

v.

Ricky L. KIDD, Appellant.

No. WD 54381.

Missouri Court of Appeals, Western District.

Feb. 23, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 30, 1999.

Application to Transfer Denied June 1, 1999.

Susan Hogan, Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Gregory L. Barnes, Asst. Atty. Gen., Jefferson City, for respondent.

Before BRECKENRIDGE, C.J., ULRICH and HANNA, JJ.

PATRICIA BRECKENRIDGE, Chief Judge.

Appellant Ricky Kidd was convicted after a jury trial of two counts of class A felony murder in the first degree, § 565.020.1, RSMo 1994,[1] and two counts of armed criminal action, § 571.015. He was sentenced as a prior offender to life imprisonment without eligibility for probation or parole for the two first degree murder convictions and life imprisonment for the two armed criminal action convictions. The four sentences were ordered to run consecutively. Mr. Kidd appealed his convictions alleging (1) the trial court erred in admitting hearsay statements not within any exception; (2) the trial court abused its discretion in denying Mr. Kidd's request for a severance from his co-defendant; and (3) the trial court erred in allowing testimony referring to Mr. Kidd as the "Terminator" because the evidence was more prejudicial than probative.

### Facts and Procedural Background

Because the sufficiency of the evidence is not at issue in this case, only a brief statement of the facts is necessary. On February 6, 1996, four-year-old Kayla Bryant was at home with her father, George Bryant, and his friend, Oscar Junior Bridges. While Kayla sat in the living room eating and watching television, she noticed a white car pull up in front of the house. When Kayla looked out the window, she saw two men dressed in black getting out of the white car. Kayla described one as skinny and the other as fat. The "skinny one" had on a black leather

---

1. All statutory references are to the Revised Statutes of Missouri 1994, unless otherwise noted.

jacket, a black hat, black pants, rings, two "circle" earrings, a bracelet, a "twist" necklace, and a watch. The "fat one" was bald and had on a black leather jacket, black pants, rings, one "circle" earring, a "twist" necklace, and a watch.

Kayla testified that she told her father someone was outside. He then looked out and opened the garage door. The two men and George Bryant went into the kitchen where Oscar Bridges was waiting. After a brief conversation, the two men pulled out guns. One man shot George Bryant, while the other chased and shot Oscar Bridges, who had fled to the basement. The two men then went through the house, as if they were looking for something. While the men were searching the house, Mr. Bryant was able to make his way outside and yelled for help. Mr. Bryant's neighbor, Richard Harris, was walking by the house when he heard Mr. Bryant's calls. He watched while a man came out and dragged Mr. Bryant behind a car, and then another man came out and shot Mr. Bryant two times. The first man came after Mr. Harris, but he was able to run away.

Mr. Kidd and his co-defendant Marcus Merrill were indicted on two counts of first degree murder and two counts of armed criminal action. At trial, Kayla testified about the events of February 6, 1996, but she was not able to identify, in court, the two men who murdered her father. Mr. Harris also testified, identifying Mr. Kidd as the second man who came out and shot Mr. Bryant. The court also allowed detectives Jay Thompson, Robert Guffey and Jay Pruetting to testify about the statements Kayla made to them regarding the events of February 6, 1996, and the identity of the perpetrators. Mr. Kidd was convicted of both counts of first degree murder and both counts of armed criminal

action. He subsequently filed a timely appeal in this court.

### Admissibility of Witness's Out-of-Court Statements to Police

At trial, Mr. Kidd objected to the admission of the detectives' testimony relating Kayla's statements to the officers about the events that transpired on the day of the murder because the statements were hearsay and were not with the exception set forth in § 491.075. The trial court ruled that the testimony was within § 491.075. On appeal, the State concedes that § 491.075 is not applicable under the facts of this case.[2] However, the State argues that the testimony concerning Kayla's out-of-court identification of Mr. Kidd was admissible under the hearsay exception announced in *State v. Harris*, 711 S.W.2d 881 (Mo. banc 1986). On appeal, Mr. Kidd argues that the detectives' testimony was inadmissible hearsay and he was prejudiced because its admission permitted the State to bolster Kayla's in-court testimony.

■ Determination of the relevancy and admissibility of evidence is a matter clearly within the discretion of the trial court and will not be reversed in the absence of an abuse of that discretion. *State v. Collins*, 962 S.W.2d 421, 424 (Mo.App. 1998). A defendant must be prejudiced by the improper admission of evidence to warrant a new trial. *Id.* Prejudice occurs when the improperly admitted evidence "materially affects the merits of the action." *State v. Larson*, 941 S.W.2d 847, 854 (Mo.App.1997). The court reviews allegations of erroneous admission of evidence for prejudice "and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State*

---

2. Section 491.075.1 permits the admission in evidence of statements of a child under twelve years of age relating to an offense under chapter 565, 566, or 568, RSMo, "performed with or on a child by another," if the statutory requirements are met. Because the two first

degree murder charges against Mr. Kidd under chapter 565 were not performed with or on a child by another, § 492.075.1 is not a basis for admission of Kayla's out-of-court statements.

*v. Richardson,* 923 S.W.2d 301, 311 (Mo. banc 1996).

At trial, Detective Jay Thompson testified about statements Kayla made to him when he interviewed her on April 11, 1996. Detective Thompson stated that during the interview, Kayla told him that early on the morning of February 6, 1996, Oscar Bridges came over to her house. Mr. Bridges and her father, George Bryant, took her to her grandmother's house and then went to the barber shop. Mr. Bridges and her father later picked her up from her grandmother's and took her to McDonald's for a Happy Meal. When they returned home, Kayla sat in the living room watching T.V. and eating her Happy Meal while Mr. Bridges and Mr. Bryant ate in the kitchen. She told Detective Thompson that the door bell rang and Mr. Bryant used a remote control to open the garage door. Two males then entered the house and spoke with Mr. Bryant and Mr. Bridges in the kitchen. She told the detective that the men pulled out guns and Mr. Bridges ran for the basement. She heard her father say, "Don't shoot me," and she saw him standing in the kitchen with his hands in the air. The man in the kitchen then shot Mr. Bryant and he fell to the ground, but he eventually ran outside. Kayla told the detective that the two men then looked through the house.

Kayla told Detective Thompson that the men were African American and were dressed in black or dark colored clothing. She described one as skinny and one as bigger. She also said one had a dark complexion, while the other was lighter. She told him that one was wearing a cap and stated that one man was wearing a gold loop chain styled earring. She said she had seen the men before when they had been to her house two days prior to the shooting.

Detective Thompson testified that he then showed her a video lineup which included Mr. Kidd. The detective had Kayla watch the video in a room with him and her mother. When Mr. Kidd appeared on the lineup stage, Kayla turned to her mother and said, "That's him." The detective told her to finish watching the video. At the end of the video all four people appeared on the screen and Detective Thompson put Kayla in a chair with wheels and pushed her closer to the T.V. so she could point to the person she recognized. The detective testified that while he was pushing Kayla toward the T.V., she became nervous and clutched his arm. When asked to point to the person she recognized in the video, she pointed to Mr. Kidd.

Detective Robert Guffey's testimony related only to Kayla's identification of Marcus Merrill, Mr. Kidd's co-defendant. However, Detective Jay Pruetting testified as to statements he obtained from Kayla on the day of the murder. Detective Pruetting testified that after arriving on the scene, he took Kayla and her mother to the station to interview them about what had happened that day. With her mother present, Kayla twice told the detective that she was at the house with her father and Oscar Bridges when her daddy's brother shot him. He asked her who "daddy's brother" was and she responded that she didn't know. Later, her mother asked if she meant Bryant's real brother and Kayla said no.

Kayla went on to tell Detective Pruetting that two black males, one skinny and one fat, came over to the house wearing black hats and black coats and driving a white car. She said her father let them in through the garage and that they both had guns when they came in the house. She told the detective they wanted her dad's money and they searched the ice box and the attic. She said Mr. Bridges was initially upstairs, but ran to the basement. She said the men "cussed a lot," but told her she would be "alright." After they left, she called 911. She also told the detective that the men had been at the house the day before.

The State concedes that the above testimony was not properly admitted under § 491.075, and this court agrees. However, if the evidence is competent under any theory, or for any purpose, the trial court did not commit error in admitting it. *State v. Russell,* 872 S.W.2d 866, 869 (Mo.App.1994). Even if the evidence was not admissible under any theory and it was error to admit it, the error does not compel the reversal of a conviction unless the error so prejudiced the defendant that the defendant was denied a fair trial. *Id.*

In considering Mr. Kidd's claim that hearsay evidence was improperly admitted, it is necessary to divide the detectives' testimony into two categories: (1) their testimony concerning Kayla's out-of-court identification of Mr. Kidd; and (2) their testimony regarding her out-of-court statements about the events of the day her father was murdered. With regard to the first category, Detectives Guffey's and Thompson's testimony about Kayla's out-of-court identification was admissible under the hearsay exception explained in *Harris,* 711 S.W.2d at 884–85. *Harris* addressed whether "testimony of a secondary witness introduced for corroboration of an identifying witness's unimpeached testimony concerning extrajudicial identification of the accused" was admissible. *Id.* at 882. The *Harris* court found:

> The issue then, is whether testimony by a police officer or similar witness to a lineup or other extrajudicial identification should be admissible to the same extent as similar testimony by a crime victim who may testify that he [or she] identified the defendant in a lineup or other extrajudicial identification. There is no logical distinction between the victim's testimony and that of another person. To the extent that the [*State v. Degraffenreid,* 477 S.W.2d 57, 64 (Mo. banc 1972) ] rule distinguishes these two classes of testimony based on hearsay considerations, the case is no longer to be followed. This does not foreclose the trial judge in [the trial judge's] discre-

tion from sustaining objections to such evidence based on other traditional grounds, but we hold today that such evidence is no longer presumptively inadmissible where declarant and the corroborating witness both testify and are subject to cross-examination.

*Id.* at 884. The *Harris* court cautioned that although such testimony is no longer excluded under the hearsay prohibition, it may still be excluded if unduly cumulative. *Id.* at 885.

"Evidence is said to be cumulative when it relates to a matter so 'fully and properly proved by other testimony' as to take it out of the area of serious dispute." *State v. McCauley,* 831 S.W.2d 741, 743 (Mo.App.1992) (quoting *State v. Weatherspoon,* 728 S.W.2d 267, 273 (Mo. App.1987)). The control of cumulative evidence is committed to the discretion of the trial court. *State v. Wade,* 926 S.W.2d 43, 45 (Mo.App.1996). We defer to the trial court in the absence of an abuse of discretion. *Id.* Additionally, "evidence is not to be rejected as cumulative when it goes to the very root of the matter in controversy or relates to the main issue, the decision of which turns on the weight of the evidence." *State v. Perry,* 879 S.W.2d 609, 613 (Mo. App.1994). "The state, especially in view of its heavy burden, should not be unduly limited in the amount of evidence it adduces, even if cumulative." *State v. Welty,* 729 S.W.2d 594, 600 (Mo.App.1987).

The trial court did not abuse its discretion in allowing the State to introduce the detective's testimony concerning Kayla's pretrial identification of Mr. Kidd, in addition to Kayla's own testimony. Mr. Kidd's only defense was alibi and he presented evidence which, if believed, placed him elsewhere at the time of the murder. Because the primary issue in the case was the identity of the man who murdered Mr. Bryant, the detectives' testimony regarding Kayla's out-of-court identification of the murderer went to the very root of the matter in controversy and related to the

main issue in the case. Additionally, the identity of the killer was a matter which turned on the weight of the evidence and the State bore the burden of proving beyond a reasonable doubt that Mr. Kidd was the killer. Therefore, the detectives' testimony related to matters that were "not so fully and properly proved by other evidence as to take it out of the area of serious dispute," so it was not unduly cumulative. *McCauley*, 831 S.W.2d at 743. We find that although the trial court admitted this evidence under the incorrect theory, the out-of-court identification testimony was admissible.

 The remaining testimony to which Mr. Kidd objects falls within the second category, the testimony of Detectives Thompson and Pruetting regarding Kayla's statements about the events of February 6. Mr. Kidd objected to the testimony on the basis that it was hearsay evidence not admissible under § 491.075. Again, we agree that it was hearsay testimony which was not admissible under § 491.075. Nor does it appear to fit within an exception to the hearsay rule, so its admission would be erroneous. However, as stated previously, when considering "matters involving the admission of evidence, the Court reviews for prejudice and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Richardson*, 923 S.W.2d at 311.

On appeal, Mr. Kidd argues that he was prejudiced by the officers' testimony because it "improperly bolstered the State's case." By this we assume Mr. Kidd is implying that the officers' testimony bolstered Kayla's credibility as a witness testifying that a man of Mr. Kidd's description was the murderer. However, we do not agree that the officers' testimony retelling Kayla's prior consistent statements regarding the shooting was improper bolstering which entitles Mr. Kidd to a new trial.

 The use of a testifying witness's prior consistent statements is substantially limited. *State v. Seever*, 733 S.W.2d 438, 441 (Mo. banc 1987). However, when there is strong evidence of the defendant's guilt, other than the witness's testimony, no prejudice results to the defendant as a result of admitting the witness's prior consistent statement. *State v. McMillin*, 783 S.W.2d 82, 99 (Mo. banc 1990). The State presented strong evidence that Mr. Kidd was the man who murdered Mr. Bryant. The identity of the murderer was established by at least one independent source. Mr. Harris testified that he was "2001% sure" that Mr. Kidd was the man he saw outside the Bryant house shooting George Bryant on February 6, 1996. In addition to Mr. Harris's testimony, the officer's testimony describing Kayla's out-of-court identification was probative of the killer's identity and admissible independent of the officer's other testimony or Kayla's testimony. *See Harris*. 711 S.W.2d at 884–85. *See also State v. Hutton*, 825 S.W.2d 883, 887 (Mo.App.1992) (Officer's testimony relating to witness's out-of-court identification of defendant corroborated witness's in-court statements "obviat[ing] any prejudice which might have been worked by [officer's] testimony about [witness's] prior consistent statements."). Because the State presented ample evidence independent of Kayla's in-court description of the man who shot her father, any bolstering of her credibility by the officers' testimony did not prejudice Mr. Kidd. *See McMillin*, 783 S.W.2d at 99 ("[A]ssuming, *arguendo*, that the testimony of [witness] was improperly bolstered, evidence of McMillin's guilt was otherwise established by strong evidence," resulting in no prejudice to McMillin.). Although the trial court erred in admitting the detectives' testimony regarding the murder, in light of the strong evidence of Mr. Kidd's guilt, we find no error so prejudicial that it deprived him of a fair trial. Point I is denied.

### Motion to Sever

 As his second point on appeal, Mr. Kidd argues that the trial court erred in denying his motion to sever because he

and his co-defendant presented conflicting defenses. Rule 24.06 and § 545.880.2 govern the propriety and procedure of severing joint trials. Rule 24.06 states that co-defendants must be tried separately only if the court finds the probability of prejudice exists or, *inter alia*, a separate trial is necessary to a fair determination of whether the defendant is guilty. *State v. Isa*, 850 S.W.2d 876, 884–85 (Mo. banc 1993). Like Rule 24.06, § 545.880.2 mandates separate trials only when the trial court finds the "probability for prejudice" to one defendant in a joint trial. *Id.* at 885. Section 545.880.2(4) directs that the trial court "shall find" the "probability for prejudice" exists if a separate trial of a co-defendant is necessary to achieve a fair determination of guilt or innocence of any defendant. *Id.*

■ "While it is the duty of the trial court to sever the trial of co-defendants if there are irreconcilable defenses, the doctrine is limited to those cases in which the jury will infer that the conflict alone demonstrated that both are guilty." *State v. Oliver*, 791 S.W.2d 782, 786 (Mo. App.1990). "[T]he risk of prejudice to a defendant from a joint trial will vary with the facts of each case. *Isa*, 850 S.W.2d at 885. "Under Rule 24.06 and § 545.880, the defendant bears the burden of affirmatively showing that the joint trial prejudiced his right to a fair trial. *See Oliver*, 791 S.W.2d at 786. The trial court has discretion over whether to sever a joint trial and its ruling will be disturbed on appeal only if there has been an abuse of discretion resulting in clear prejudice to the defendant. *Isa*, 850 S.W.2d at 885; *Oliver*, 791 S.W.2d at 786. Often, severance is not required when a less drastic course will prevent prejudice to the defendant. *Isa*, 850 S.W.2d at 885. For example, the trial judge may cure any prejudice from a joint trial by properly instructing the jury. *Id. See also Oliver*, 791 S.W.2d at 786. Juries are presumed to follow the court's instructions. *Isa*, 850 S.W.2d at 885.

■ In this case, Mr. Kidd contends that he was entitled to a separate trial because he and his co-defendant presented irreconcilable defenses. Mr. Kidd argued alibi, while Mr. Merrill argued mistaken identity. These defenses are not inherently irreconcilable. The jury would not be forced to infer from believing Mr. Merrill's defense that Mr. Kidd was necessarily guilty or that both were guilty. In support of his argument that he and Mr. Merrill presented irreconcilable defenses, Mr. Kidd relies heavily upon a statement made by co-defendant's counsel during closing argument. In closing argument, Mr. Merrill's attorney said, "The evidence . . . showed you with abundant clarity that Ricky Kidd was involved with the deaths of George Bryant and Oscar Bridges." The issue is whether the quoted portion of Mr. Merrill's closing argument demonstrates irreconcilable defenses prejudicing Mr. Kidd. Since no Missouri case was cited which addressed a similar factual situation, we follow the example of other Missouri courts and look to federal law. In *Isa*, the Missouri Supreme Court relied on *Richardson v. Marsh*, 481 U.S. 200, 209, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987), in its analysis of when severance of joint trials is appropriate. 850 S.W.2d at 885 (Finding that "[a] motion to sever is appropriate only where there exists a serious risk of compromise of the defendant's rights or the jury's ability to make a reliable judgment about guilt or innocence."). Additionally, the Eastern District has turned to the Eighth Circuit in deciding whether severance is warranted when there was no Missouri law on point. *See Oliver*, 791 S.W.2d at 786 (drawing on *United States v. Reeves*, 674 F.2d 739, 744 (8th Cir.1982)). Because there are no Missouri cases with facts analogous to this case, we turn to federal cases with similar facts for guidance on when severance is required to ensure each defendant a fair trial.

Addressing a factual situation nearly identical to this case, the Eight Circuit

held that a co-defendant's finger-pointing during closing argument did not demonstrate an irreconcilable conflict between the defenses. *United States v. Wilson,* 103 F.3d 1402, 1408 (8th Cir.1997). In *Wilson,* Fred McGee argued that his co-defendant Barry Wilson's closing argument was evidence of an irreconcilable conflict between the defendants which required severance. *Id.* During closing argument, Wilson's counsel made the following statement:

> Mrs. Wright was down in Phoenix with Bird and Boom and a girlfriend talking about Fred [McGee]. At the airport, Fred [McGee] signs the paperwork.... At the Hampton Inn, they are waiting for Fred [McGee]. Fred [McGee] shows up. Fred [McGee] runs, Fred [McGee] hops in the van ... Fred [McGee] did that. They get Fred's [McGee's] fingerprints.... Fred, Fred, Fred, Fred ... but you don't hear about Barry [Wilson].

*Id.*

Reviewing for an abuse of discretion, the Eighth Circuit stated that "the mere possibility of inconsistent interests ... is not enough to require overturning verdicts reached in a joint trial." *Id.* The Court found that Wilson's closing argument did not show an irreconcilable conflict and that, even if such a conflict existed, "it came to light only in the closing argument when the jurors were already well familiar with the facts against the individual defendants." *Id.* Additionally, the Court expressed concerns about wasting judicial resources by reversing a conviction in a joint trial on "such speculative grounds." *Id.*

In another federal appellate case, *United States v. Salameh,* 152 F.3d 88, 116 (2d Cir.1998), the court was asked to decide if a defendant was prejudiced when his co-defendant attempted to place responsibility for the crime upon a third co-defendant during closing argument. The appellant in *Salameh* argued and the court found that the co-defendant's closing argument was inconsistent with the appellant's defense. *Id.* Throughout trial, all four defendants maintained that a bomb did not cause the explosion at the World Trade Center which they were charged with causing. *Id.* During closing arguments, one defendant, Salameh, changed his strategy and argued that he was the "unwitting dupe" of another defendant, Yousef, who had masterminded the bombing. *Id.* However, the court found that because neither defendant's claim of innocence required the jury to find the other guilty, no prejudice to the defendant occurred. *Id.* The court further explained that any possibility of prejudice was eliminated by the court's instructions to the jury admonishing them that each defendant's guilt had to be separately and individually evaluated. *Id.* at 116–117.

In *Salameh,* the court looked to Federal Rule of Criminal Procedure 14 to determine if Salameh's closing argument warranted severance. *Id.* at 116. Rule 14 provides for severance of a joint trial "[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses...."[3] *Id.* Addressing the defendant's argument for severance, the court stated, "'Mutually antagonistic' or 'irreconcilable' defenses may be so prejudicial in some circumstances as to mandate severance." *Id.* (quoting *Zafiro v. United States,* 506 U.S. 534, 538, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993)). However, the Court went on to explain that "[i]n order to make a showing of 'mutually antagonistic' or 'irreconcilable defenses,' the defendant must make a factual demonstration that 'acceptance of one party's defense would tend to preclude acquittal of [the]

---

**3.** Although the language of Federal Rule 14 appears to give the district court more discretion to determine when a severance is required than does the language of Missouri Rule 24.06 and § 545.880, Missouri case law indicates that a trial court does have considerable discretion in determining when a severance is warranted. *See Isa,* 850 S.W.2d at 885. Therefore, we find that severance under federal law and under Missouri law is sufficiently similar for the federal analysis to be applicable to the present case.

other.'" *Id.* (quoting *United States v. Smith,* 788 F.2d 663, 668 (10th Cir.1986) (internal quotation marks and citation omitted)). Further, the court stated that even if the defenses were mutually antagonistic, that did not render them prejudicial per se and the trial court had the discretion to tailor the appropriate relief if any prejudice were shown. *Id.* The court then found that there was nothing directly antagonistic between the two defense theories which required reversal based on the trial court's refusal to sever the trial, especially in light of the jury instructions. *Id.* at 116–17.

The United States Supreme Court has also considered when a severance is required under Federal Rule 14. In *Zafiro,* 506 U.S. at 536, 113 S.Ct. at 936, four defendants were convicted on drug-related charges. Each defendant claimed he or she was ignorant of the drug conspiracy and that the drugs belonged to another defendant. *Id.* Throughout the proceedings, the defendants requested severance of the trial. *Id.* Declining to adopt a per se rule that severance was required whenever co-defendants presented conflicting defenses, the Supreme Court said a severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 538–39, 113 S.Ct. at 938. The Court also noted that "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* Focusing on the curing instructions, the Court stated that juries are presumed to follow instructions given by the trial court. *Id.* at 540, 113 S.Ct. at 939.

In *Zafiro,* the jury was instructed that "the Government had 'the burden of proving beyond a reasonable doubt' that each defendant committed the crimes for which he or she was charged." *Id.* at 541, 113 S.Ct. at 939. The district court also instructed the jury that it must "give separate consideration to each individual defendant and to each separate charge against

him. Each defendant is entitled to have his or her own case determined from his or her own conduct and from the evidence [that] may be applicable to him or to her." *Id.* The court further instructed the jury that opening and closing arguments were not evidence. *Id.* The Supreme Court found these instructions "sufficed to cure any possibility of prejudice" the defendants may have suffered because of their joined trial. *Id.*

 We find the foregoing analyses of when it is necessary to sever a joint trial because of prejudice from conflicting defenses persuasive and consistent with Missouri law. We agree with the Eighth Circuit's conclusion that finger-pointing in closing arguments does not evidence irreconcilable defenses requiring severance. *See Wilson,* 103 F.3d at 1408. Further, we agree with the Second Circuit's holding in *Salameh* that to show prejudice from potentially antagonistic defenses, the defendant must make a factual showing that "acceptance of one party's defense would tend to preclude acquittal of the other." *See Salameh,* 152 F.3d at 116. Finally, this court finds the Supreme Court's analysis of the effect of jury instructions particularly applicable to cases such as this where there was an isolated incident of finger-pointing.

 In this case, Mr. Kidd has not made any factual showing of prejudice. He points to a single statement in closing argument. This does not demonstrate that the co-defendants' defenses were mutually antagonistic, and the jury instructions sufficed to cure any possibility of prejudice resulting from his co-defendant's accusatory statement in closing argument. The jury was given instructions nearly identical to the jury instructions in *Zafiro.* Instruction number fifteen admonished the jury as follows:

You must give separate consideration to each defendant and to each count submitted against him. Each defendant is entitled to have his case decided on the evidence and the law which is applicable to him.

* * *

You may find any one or both of the defendants guilty or not guilty of any count submitted against him.

You should return a separate verdict as to each defendant on each count submitted against him.

Instruction number seventeen admonished the jury that the attorneys would present their closing arguments, but "they are not evidence." Juries are presumed to follow instructions and these instructions were adequate to cure any potential prejudice resulting from co-defendant Merrill's closing argument. *See Zafiro*, 506 U.S. at 541, 113 S.Ct. at 939. Point two is denied.

### Admissibility of Mr. Harris's Testimony Referring to Mr. Kidd as "the Terminator"

As his final point on appeal, Mr. Kidd argues that the trial court erred in permitting Mr. Harris to testify that he had referred to Mr. Bryant's shooter as "The Terminator." [4] He argues that the testimony was irrelevant because it did not tend to prove any fact or corroborate other evidence and it was prejudicial because it "added an unnecessarily theatrical gruesomeness to the case." The State argues that the epithet was supported by the evidence and was actually part of the evidence, providing a foundation and support for Mr. Harris's identification of Mr. Kidd. Further, the State argues that even if the testimony should have been excluded, Mr. Kidd was not prejudiced by its inclusion in light of the overwhelming evidence of guilt. We agree with the State that the testimony was admissible as part of the evidence and that Mr. Kidd was not prejudiced by the killer being referred to as "The Terminator."

■ As previously stated, determination of the relevancy and admissibility of evidence is a matter clearly within the discretion of the trial court and will not be reversed in the absence of an abuse of that discretion. *Collins*, 962 S.W.2d at 424. A defendant must be prejudiced by the improper admission of evidence to warrant a new trial. *Id.* Prejudice occurs when the improperly admitted evidence "materially affects the merits of the action." *Larson*, 941 S.W.2d at 854. The court reviews allegations of erroneous admission of evidence for prejudice "and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Richardson*, 923 S.W.2d at 311. When evidence tends to prove or disprove a fact in issue or when it corroborates other material evidence, it is relevant and admissible. *State v. Nguyen*, 880 S.W.2d 627, 636 (Mo. App.1994). Evidence is legally relevant when its probative value outweighs its prejudicial effect. *State v. Stallings*, 957 S.W.2d 383, 390 (Mo.App.1997). Balancing the probative value against the prejudicial effect of the offered evidence is within the discretion of the trial court. *Id.*

■ The trial court did not abuse its discretion in permitting Mr. Harris to testify that he nicknamed the killer "The Terminator." Mr. Harris testified at trial that he nicknamed the man who shot Mr. Bryant "The Terminator" during a police interview following the murder. He then referred to Mr. Kidd as "The Terminator" when he identified Mr. Kidd as the murderer in a photo lineup. Mr. Harris testified that he referred to the killer as "The Terminator" because of the way he walked and the way he executed the victim. The trial court found the testimony was relevant because it described the demeanor of the man who shot Mr. Bryant. We agree with the trial court that the demeanor of the murderer at the time he shot Mr. Bryant was relevant.

■ In addition, the probative value of this relevant evidence outweighs any prejudicial effect to Mr. Kidd. Mr. Kidd's defense was alibi. If the jury believed Mr.

4. "The Terminator" is a character in an action movie of the same name, who is a merciless, robot killer.

Kidd's defense, that he was not the killer, the reference would not have impacted him. It is not likely that the jury was influenced to disbelieve Mr. Kidd's alibi defense because of Mr. Harris' description of the manner in which the murderer shot Mr. Bryant. The potential for prejudice, if any, would have arisen at the time of sentencing when the culpability of Mr. Kidd in committing the murder would be at issue. In this case, however, the jury did not recommend a sentence to the trial court, since Mr. Kidd had been adjudicated a prior offender. Therefore, the potential for prejudice to Mr. Kidd from the jury being inflamed by the description of his demeanor when he shot Mr. Bryant was limited. The trial court did not abuse its discretion by permitting the testimony. Point III is denied.

The judgment of the trial court is affirmed.

All concur.