In the Missouri Court of Appeals
 Eastern District
 DIVISION TWO

STATE OF MISSOURI, ) ED108483
 )
 Respondent, ) Appeal from the Circuit Court of
 ) the City of St. Louis
v. ) 1822-CR02030-01
 )
CORLISS F. MACK, JR., ) Honorable Michael W. Noble
 )
 Appellant. ) Filed: may 25, 2021

 Corliss F. Mack, Jr. (Appellant) appeals from the trial court’s judgment, following a jury

trial, convicting him of two counts of second-degree murder and two counts of armed criminal

action. He was sentenced to four, concurrent 20-year sentences. We affirm.

 BACKGROUND

 The State of Missouri (State) charged Appellant and his co-defendant, Qiana Fletcher

(Co-Defendant), with two counts of the class A felony of first-degree murder (Counts I and III)

and two counts of the unclassified felony of armed criminal action (Counts II and IV) for

knowingly causing the death of Ira Johnson (Johnson) and Sylvester Caston (Caston) with a

deadly weapon. They were also charged with first-degree robbery (Count V), first-degree

kidnapping (Count VII), and additional counts of armed criminal action (Counts VI and VIII) for

events occurring on May 19, 2018.
 Prior to trial, Appellant and Co-Defendant each filed a motion to sever Appellant’s case

from Co-Defendant’s case to hold separate trials. Appellant’s motion was based on Co-

Defendant’s out-of-court statement to police, which then denied her presence in the alleged

incidents. The court denied the motions, finding both Appellant and Co-Defendant would be

arguing they were victims, not perpetrators, and these defenses were not inherently

irreconcilable. Appellant also filed a motion in limine to prevent introduction of Co-Defendant’s

statement to police, which was agreed to by consent, unless it was offered as impeachment

evidence. The court noted if the statement became an issue, they would discuss it outside of the

presence of the jury.

 A trial took place September 23-27, 2019. The State presented Keyshia Harris (Witness)

as its first witness, followed by several detectives and law enforcement officers, the property

manager for Shepherd Apartments, and a woman who lived in the area and testified she heard

gunshots. For the defense, Appellant testified but Co-Defendant did not. This case considers the

sufficiency of the evidence on appeal; thus, we view the evidence in the light most favorable to

the verdict, disregarding any contrary evidence and inferences. State v. Stewart, 560 S.W.3d

531, 533 (Mo. banc 2018). The evidence adduced at trial is as follows.

 Witness and Appellant knew each other “almost over twenty years,” and he was a cousin

of her niece and nephews. Witness admitted she regularly sold heroin to Appellant. On May 19,

2018, at approximately 6 p.m., she had delivered “a fourth” of heroin to Appellant. Later, at

8:44 p.m., Appellant called Witness to trade her some marijuana for more heroin. Witness could

not find any heroin but decided to meet and offer Appellant $80 for the marijuana. She drove to

Appellant’s apartment building where she usually met him in the parking lot, but this time

Appellant met her in the street. He was with a woman whom Witness did not know but was later

 2
identified as Co-Defendant. Appellant walked up to Witness’s car and sat in the front passenger

seat. Shortly thereafter, Co-Defendant sat behind Appellant in the rear passenger seat. Witness

recalled Appellant saying, “Sis[,] she want it,” and Co-Defendant moved around to get

something out of her pocket. Co-Defendant then pulled out a “little bitty small little . . . black

gun,” “put the gun up to [Witness],” and said, “[B]----, give it up, because this is your last night

anyway.” Co-Defendant was wearing blue latex gloves. Witness believed Co-Defendant meant

she would kill her, so Witness gave her the $80. Appellant did not say a word.

 Co-Defendant told Witness to make a U-turn, and continue driving until she drove up to

two men in the street where Co-Defendant ordered Witness to stop. The two men, later

identified as Johnson and Caston, walked up to Witness’s car. Caston punched Witness in the

face, threw her into the back seat, then sat down next to her. Johnson sat in the driver’s seat.

They also wore blue latex gloves, but Appellant did not. They told Witness to take them to her

house. Appellant, still in the front passenger seat, spoke to Witness for the first time since the

two men joined them and said, “[T]ell them where you stay because they are going to kill us.”

She told them Grand and Natural Bridge, but that was not where she lived. Johnson drove the

car to the East Side in Illinois. They stopped near a wooded area where Caston ordered Co-

Defendant to strip-search Witness while Appellant and Johnson searched her car. Co-Defendant

told Witness that “[she] like[d] everything about [Witness] [] because [she’d] had this gun on

[Witness], and [she] once not [sic] beg for [her] life.”

 They returned to the car and drove back to St. Louis. Witness said she was mad at

Appellant and was “going off on him” for doing this to her. Johnson “just kept on talking” and

said Appellant had nothing to do with this, but Witness did not believe him. She believed

“[Appellant] was part of it” because he was “the one that called [her]” and she did not know the

 3
others. They arrived in St. Louis approximately an hour after they left. Witness thought

“everything was over” and she was going to be released. Johnson stopped the car in the street

and Appellant, Co-Defendant, and Caston got out and walked a little way down the street

together. Witness and Johnson remained in the car, and Johnson told her she needed to get out of

“whatever [she] [was] doing” because it was “not for [her].” Appellant returned to the car, sat in

the front passenger seat and shot Johnson in the head. Witness testified Appellant used the same

gun that Co-Defendant held throughout the night. She said, “[Johnson] never had a gun” and

that she only saw one gun the whole time.

 Witness further testified that Appellant got out of the car and ran down the street in the

same direction he previously went with Co-Defendant and Caston. Witness was hiding for cover

and scared when she heard approximately five gunshots from the same direction. Witness hid in

a backyard for a short time, then came out to find her car was gone. She was crying and was

walking to a gas station with some kids when Appellant drove her car up beside her with Co-

Defendant in the passenger seat. He told her, “Sis, sis, get in, I did that for you.” Witness

replied, “ah, no you didn’t,” and ran to the gas station to call the police.

 The police responded at approximately 10:15 or 10:30 p.m. They found Johnson’s dead

body in the street with a gunshot wound to his right ear, $80 cash in his pocket, and loose change

in another pocket. They found Caston lying dead on a sidewalk around the corner with five

gunshot wounds, including one to the left side of his chest that caused his death. Both victims

were still wearing blue latex gloves. Police found a cluster of seven cartridge casings

approximately 30 to 40 feet down the street from Johnson. They were all .380 caliber and were

later determined to have been fired from the same firearm.

 4
 Witness testified that she found her car the next morning after Appellant and his cousin

told her where it was. Johnson’s blood was visible on the driver’s seat. Police found a cartridge

casing in the map pocket of the front passenger door, which was a .380 caliber and was

determined to have been fired from the same firearm as the casings that were found at the murder

scene in the street. They found lip gloss on the front passenger seat and an inhaler on the rear

passenger seat, which contained DNA consistent with Co-Defendant’s. Police also found a blue

latex glove on the front passenger floorboard, which contained a mixture of DNA, including

DNA consistent with Johnson.

 Surveillance cameras around Appellant’s apartment building continuously recorded

footage, which was reviewed and used to create still photographs that were admitted into

evidence. One photograph showed three men, whom Witness identified as Appellant with

Johnson and Caston, in the lobby of the building at 8:09 p.m. Johnson and Caston were recorded

exiting through the lobby at 9:03 p.m. Appellant and Co-Defendant were recorded exiting

through the lobby at 9:06 p.m. Johnson and Caston were recorded walking north past the

building at 9:21 p.m., and Witness’s vehicle was recorded driving in that direction four minutes

later at 9:25 p.m. Witness’s vehicle was again recorded driving in that direction, toward the

location where it was ultimately found, at 10:36 p.m., at the same time Witness was speaking

with the police. Appellant and Co-Defendant were recorded approaching the building three

minutes later at 10:39 p.m. and re-entered the building at 10:40 p.m.

 A box with blue latex gloves identical to the ones worn by Johnson and Caston was found

in the apartment where Appellant lived, even though he did not wear any blue latex gloves

during the incident. Caston’s “live-in girlfriend” told the detectives that Caston kept a .380

 5
caliber handgun in his nightstand and that she noticed it was gone at some point after she last

saw Johnson and Caston leave the house on the night of the incident around 7 p.m.

 Appellant testified that Caston was friends with his uncle. He would come over to their

apartment and sometimes sold heroin to him. Appellant occasionally saw Caston with a gun, and

previously told Appellant he had executed someone in retaliation for having been shot by the

person. Appellant said Caston had the reputation as “somebody that you [don’t] want to mess

with,” and robbing drug dealers. Appellant said Caston and Johnson came to his apartment and

“got high” on the day in question. Appellant said Co-Defendant, with whom he had a sexual

relationship, was also present.

 Appellant said he called Witness to buy more heroin. She called him back and told him

to come outside around 9 p.m. Appellant said he and Co-Defendant got in Witness’s car, but that

Johnson and Caston “left out, like, right before [him]” and denied knowing where they went.

Appellant’s story then differed from Witness in that he claimed he paid Witness $80 for heroin,

which he obtained from the console of her vehicle. He said Witness asked Appellant to “ride

with [her] real quick” and she would give him something else. Appellant said Witness made a

U-turn to where Johnson and Caston were standing. He said he did not know they were going to

be there and had no idea what they were planning to do. Appellant said Caston got in and pulled

out a gun, told Witness to let Johnson in, and pulled Witness back through the middle of the car.

He said, “[I]f anybody make [sic] any move, it’s going to be . . . open cases and closed caskets.”

 Appellant testified that Johnson drove them to the East Side and Caston said he had to

search Witness because he knew she had some more dope. Appellant said Caston tried to make

Co-Defendant search her, but she wouldn’t do it, so he told Co-Defendant, “I got something for

you, too.” He said Caston had the gun while they were driving, but handed it to Johnson when

 6
they stopped in a parking lot so that Caston could strip-search Witness. Appellant denied that

Co-Defendant had the gun, wore latex gloves, or participated in a robbery. He said Johnson

opened the console and removed some change while Caston was searching Witness. Johnson

kept the gun while doing so, and while he drove them back to St. Louis.

 Appellant said that when they stopped the car, Johnson pointed the gun at Appellant

while Caston asked him, “[Y]ou going to handle this[?]” He testified that Caston pulled Co-

Defendant over Witness and out of the car, saying “I got something for this b----, she want to be

smart, she don’t want to do what the f--- I told her to do.” Witness screamed and Appellant

grabbed the gun from Johnson and “just shot.” Appellant said he then jumped out of the car and

saw Caston pulling Co-Defendant. Caston turned around toward him and Appellant “just started

shooting.” Appellant testified he shot and killed Johnson and Caston with the only gun that was

present that night. He admitted he drove Witness’s car away from the scene, threw away the

murder weapon, and stayed in a hotel for a few days with Co-Defendant before leaving for

Texas. He was arrested less than 24 hours after returning to the St. Louis motel where Co-

Defendant was staying.

 Appellant filed motions for judgment of acquittal at the close of the State’s evidence and

at the close of all of the evidence, which the trial court denied. The jury found Appellant guilty

of the lesser offenses of conventional second-degree murder in Counts I and III and the related

offenses of armed criminal action in Counts II and IV, and not guilty of Counts V through VIII.

The jury also found Co-Defendant not guilty on all eight counts. The trial court found Appellant

was a persistent offender and subsequently sentenced him to concurrent terms of 20 years of

imprisonment on each of Counts I through IV. This appeal follows. Additional facts will be

discussed as they are relevant to Appellant’s claims of error on appeal.

 7
 DISCUSSION

 Appellant’s four points on appeal allege the trial court’s rulings throughout Appellant’s

case denied his rights to due process and a fair trial. He alleges the trial court abused its

discretion in responding to the jury’s question during deliberation, denying his request for a

mistrial based on an unruly crowd during trial, denying his motion to sever trial from Co-

Defendant’s trial, and denying his motion for judgment of acquittal based on Appellant acting

under the influence of sudden passion arising from an adequate cause. Based on these alleged

errors, Appellant argues this Court must reverse and remand for a new trial.

 Point I

 In his first point, Appellant alleges the trial court abused its discretion by responding with

an admonition to be guided by the instruction as given when the jury questioned, “If we can’t

agree on robbery, can we convict on manslaughter with ACA [armed criminal action].”

Appellant argues the question indicated the jury’s confusion about the instructions, which were

numerous, complicated, and presented a number of verdict possibilities, including voluntary

manslaughter and felony murder. He argues that under the circumstances, it was necessary to

clarify that the absence of a jury finding that Appellant committed robbery in the first degree

would not preclude conviction of voluntary manslaughter, like it would conviction of felony

murder. Appellant further claims by refusing to respond to the jury’s question in the affirmative,

the trial court prejudiced him in that there was a reasonable probability that a “yes” answer

would have resulted in voluntary manslaughter verdicts. He alleges the trial court’s ruling

denied his rights to due process and a fair trial, as guaranteed by the Sixth and Fourteenth

Amendments to the United States Constitution and Article I, Sections 10 and 18(a) of the

Missouri Constitution. Appellant argues this Court must reverse and remand for a new trial.

 8
 Jury Instruction No. 9 provided instruction to the jury on Count I as follows:

 As to Count I, if you do not find [Appellant] guilty of murder in the first
 degree under Instruction No. 5, or murder in the second degree under Instruction
 No. 7, or murder in the second degree under Instruction No. 8, you must consider
 whether he is guilty of voluntary manslaughter under this instruction.
 As to Count I, if you find and believe from the evidence beyond a
 reasonable doubt:
 First, that on or about May 19, 2018, in the State of Missouri, [Appellant]
 caused the death of [Johnson] by shooting him, and
 Second, that [Appellant] knew that his conduct was practically certain to
 cause the death of [Johnson], and
 Third, that [Appellant] did not act in lawful defense of another person as
 submitted in Instruction No. 36, and
 Fourth, that [Appellant] did not act in lawful self-defense as submitted in
 Instruction No. 38,
 Then you will find [Appellant] guilty under Count I of voluntary
 manslaughter.

 Instruction No. 18 was identical to Instruction No. 9, except it referenced Count III

concerning the murder of Caston.

 Additionally, Instruction No. 44 stated, in pertinent part:

 You must give separate consideration to each defendant and to each count
 submitted against him or her . . . . Each of the offenses submitted and the
 evidence and law applicable to it should be considered separately . . . . You may
 find any one or both of the defendants guilty or not guilty of any count submitted
 against him or her. . . .”

 After these instructions were given and the jury began deliberations, the jury submitted a

question to the court: “If we can’t agree on one count, are the other counts thrown out?” The

attorneys discussed with the court and the prosecutor suggested, “I would say you could say no. .

. .” Co-Defendant’s attorney agreed with that response. The trial court stated, “After discussions

with attorneys, they are all in agreement the Court should respond to the . . . question no.” The

court responded to the jury’s question: “No.”

 Approximately twenty minutes later into deliberations, the jury submitted another

question: “If we can’t agree on robbery can we convict on manslaughter with ACA?” The

 9
prosecutor suggested to the court, “Yes,” but the trial court said, “I don’t think I can answer that.

I think I have to do [‘]you’ve got to be guided by [the instructions given’].” The prosecutor

responded, “That’s true. Because the instruction tells them that.”

 Appellant’s attorney (Defense Counsel) asked, “Can we say yes?” The trial court replied,

“No. You don’t get to – nice try.” Defense Counsel said, “It’s true.” The trial court stated it

would be willing to consider drawing the jury’s attention to particular instructions, but both the

prosecutor and Co-Defendant’s attorney responded that they preferred a more general response.

The trial court responded to the jury’s question: “[Y]ou must be guided by the instructions as

given.”

 The jury found Appellant not guilty of robbery but guilty of conventional second-degree

murder and armed criminal action. Appellant’s motion for a new trial included the claim that the

court erred in denying Defense Counsel’s proposed response to the deliberating jury’s question

because “it seem[ed] necessary to answer the jury’s question as the instructions were numerous

and complicated.”

 Standard of Review

 “The response to a jury question is within the sound discretion of the trial court and the

practice of exchanging communications between the judge and jury is not commended.” State v.

Brandolese, 601 S.W.3d 519, 532-33 (Mo. banc 2020) (internal citations omitted). This Court

will find a circuit court abused its discretion only when a ruling is

 clearly against the logic and circumstances then before the court and is so arbitrary
 and unreasonable as to shock the sense of justice and indicate a lack of careful
 consideration; if reasonable persons can differ about the propriety of the action
 taken by the trial court, then it cannot be said that the trial
 court abused its discretion.

 10
Id. at 533 (citing State v. Brown, 939 S.W.2d 882, 883-84 (Mo. banc 1997)). This Court

“reviews the trial court for prejudice, not mere error, and will reverse only if the error was so

prejudicial that it deprived the defendant of a fair trial.’” Id. at 533-34 (internal citations

omitted). “Trial court error is not prejudicial unless there is a reasonable probability that the trial

court's error affected the outcome of the trial.” Id. at 534.

 Analysis

 The court must be cognizant of the need to discourage communications from the jury that

cannot be answered (e.g., requests for more evidence, argument, etc.), and at the same

time, not discourage legitimate inquiry. State v. Guinn, 58 S.W.3d 538, 548 (Mo. App. W.D.

2001). Neutral and generic responses about being guided by the evidence presented and to

follow the instructions previously given are therefore not only the safest but the most favored.

Id. When a trial court gives instructions to the jury that are correct, clear and unambiguous, then

it is not improper for the trial court to instruct the jury to be guided by those instructions.

Roberts v. State, 232 S.W.3d 581, 584 (Mo. App. E.D. 2007); State v. Clay, 975 S.W.2d 121,

134 (Mo. banc 1998). “Responses that simply refer the jury to the proper instructions already

given are not improper.” Brandolese, 601 S.W.3d at 533 (citing State v. Johnston, 957 S.W.2d

734, 752 (Mo. banc 1997)). Conversely, when a jury's question indicates confusion about

the instructions, the court should respond with “concrete accuracy.” Guinn, 58 S.W.3d at 548

(citing Clay, 975 S.W.2d at 134).

 Here, Appellant does not argue the instructions were improper or insufficient to answer

the jury’s question submitted during deliberation. In fact, Instruction No. 44 clarified to the jury

that it was permitted to find Appellant guilty or not guilty “of any count submitted against him.”

Moreover, the instructions for voluntary manslaughter provided all the elements necessary to

 11
find Appellant guilty, which did not include an element of a robbery finding as the jury had

questioned. Instructions for felony murder, however, do include such element.

 We do not find that the jury was misled to the defendant's prejudice by the answer given

by the trial court, as it merely suggested to the jury that they had their answer if they would

consider the correct, clear and unambiguous instructions already given. State v. Johnston, 957

S.W.2d 734, 752 (Mo. banc 1997), as modified on denial of reh'g (Dec. 23, 1997); State v.

Duisen, 428 S.W.2d 169, 177 (Mo. banc 1967), cert. denied, 390 U.S. 962 (1968); State v.

Grant, 275 S.W.2d 332, 335 (Mo. 1955). The jury’s finding of Appellant’s guilt on second-

degree murder alongside a verdict of not guilty on the robbery charge proved that the jury

answered its own question. Additionally, the jury’s finding Co-Defendant not guilty of both

robbery and felony murder demonstrates that the jury followed the instructions given and any

confusion it may have had was resolved upon reviewing the instructions when reminded by the

court.

 We find the instructions to be proper; therefore, the trial court did not abuse its discretion

in directing the jury to be guided by these instructions. Appellant’s first point is denied.

 Point II

 In his second point, Appellant alleges the trial court abused its discretion in denying his

request for a mistrial after Johnson’s family members yelled from the gallery, “Kill them all,”

and “You killed my baby’s daddy,” in jurors’ presence. Appellant claims the emotional

outbursts were so prejudicial that they deprived Appellant of his rights to due process of law and

a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States

Constitution and Article I, Sections 10 and 18(a) of the Missouri Constitution. Appellant argues

this Court must reverse his convictions and remand for a new trial.

 12
 During cross-examination of Witness, the trial court reacted to a disruptive crowd in the

court: “Hold on one second. Ladies and gentlemen of the galley [sic], it is a privilege to be here.

If you keep up talking, then I’m going to throw you out. Is that clear?”

 On the morning of the third day of trial, Defense Counsel told the trial court that

comments were made by Johnson’s family members the prior day within the presence of the

jury. He stated, “I believe it was a comment from his father about killing them all. I believe

referring to [Appellant] and [Co-Defendant]. And a comment about killing a baby daddy as

well, directed at [Appellant], while the jury was in the courtroom.” Defense Counsel noted that

“[she] wasn’t paying attention to what was going on out there, [she] was not aware until this

morning that the jury was in the room when those things were said.” Defense Counsel then

requested a mistrial based on those comments.

 The State responded, “Your Honor, I didn’t hear anything.” The trial court asked, “Was I

present? Because I don’t remember hearing any comments.” Defense Counsel answered, “I

believe so. I’m not sure. I’m not sure if it was while the jury was still seated, or if they were in

the process of going out of the room . . . .” The State replied, “Your Honor, I did not hear

anything, but [the State’s intern] from Washington Law School, did hear something else.” The

intern then offered, “I heard – it was as the jury was in the process of walking out of the room, so

their backs were turned to the gallery. I heard someone lean over and just say, you killed him,

you killed him, as she was on her way out of the courtroom.”

 The trial court took the matter under advisement and consulted with a colleague before

deciding to question each of the jurors separately as to whether they “heard anything at all that

may have had an effect on [their] impression of the case from outside the evidence.” When the

trial court asked, “All right?” Defense Counsel replied, “Okay. Thank you.” In denying the

 13
State’s suggestion to specifically reference the spectators, the trial court noted that “[they] don’t

know who has heard it” and the court did not want to “draw[] attention to that.” All the jurors

answered the trial court’s question in the negative.

 Defense Counsel stated that “[she] would still just like [her] objection noted.” The trial

court stated, “The Court, after inquiring from the members of the panel one at a time, does not

believe that the—although I do believe comments were made, as they were heard by these two

members, it’s my opinion that the jurors did not hear those comments, and that it—and—based

on the inquiry that we just had. So your motion for a mistrial is denied.”

 The trial court further admonished the spectators in the gallery at length that “[they] are

not allowed to give mean looks or make comments to the defendants, to the jurors, to the

attorneys, or anybody” and that “[i]f [they] inject [themselves] into this process, [the court]

[would] remove [them] from the courtroom.” The trial court asked if that was “clear” and

insisted that “[e]verybody nod . . . so [it] kn[e]w that everybody [was] in agreement.”

 After the close of the State’s evidence, Defense Counsel noted that Johnson’s family

members were still “aggressively staring, leaning on the railing. Particularly the gentleman that

came in the blue cap and created some problems yesterday. I don’t know if it’s worth talking to

them again –” The trial court replied that “[h]e leaned forward one time, but [the court] watched

him, he didn’t make any –[the court] didn’t see any gestures. And [the court] ha[d] seen the

sheriff have to wake him up twice.” Defense Counsel stated that “every time [she’d] looked over

at him he’s staring directly at [Appellant].” The trial court replied, “All right. Let’s do this.

Let’s put him in the back row. All right? . . . That way he’s not front row eyeballing.”

 Appellant included this claim of error in his motion for a new trial. In denying the

motion, the trial court stated that “it was the Court’s intention not to be overly suggestive and . . .

 14
the Court believes by specifically directing the jurors to any particular thing would have been

more suggestive.”

 Standard of Review

 Although emotional outbursts are to be prevented insofar as possible, the trial court

exercises broad discretion in determining the effect of such outbursts on the jury. State v.

Brooks, 960 S.W.2d 479, 491 (Mo. banc 1997), cert. denied, 524 U.S. 957 (1998). The drastic

decision of a mistrial “is left to the discretion of the trial court, as it is in the best position to

determine whether the incident had a prejudicial effect on the jury.” State v. Blurton, 484

S.W.3d 758, 779 (Mo. banc 2016) (citing State v. Ward, 242 S.W.3d 698, 704 (Mo. banc 2008)).

A trial court abuses its discretion to grant a mistrial only if “its ruling is clearly against the logic

of the circumstances before it and when the ruling is so arbitrary and unreasonable as to shock

the appellate court's sense of justice and indicate a lack of careful consideration.” Id. A mistrial

should be used only “in those extraordinary circumstances in which the prejudice to the

defendant cannot otherwise be removed.” Id. A trial court may also grant a mistrial if an

evidentiary error is intentionally injected into the trial. Id. (citing State v. Aguilar, 478 S.W.2d

351, 355 (Mo. 1972)).

 Analysis

 Murder trials are inherently emotional. State v. Jensen, 524 S.W.3d 33, 43 (Mo. banc

2017). Although emotional outbursts are to be prevented insofar as possible, neither the trial

court nor counsel possess complete control over witnesses or spectators. State v. Johnson, 672

S.W.2d 160, 163 (Mo. App. E.D. 1984). “Where outbursts occur, the trial court may exercise

broad discretion in minimizing or eliminating the prejudicial impact of an hysterical witness or

gallery member.” Brooks, 960 S.W.2d at 491. “In determining whether to declare a mistrial,

 15
the trial court may consider the spontaneity of the outburst, whether the prosecution was at fault,

whether something similar, or even worse, could occur on retrial, and the further conduct of the

trial.” Id.

 In State v. Johnson, this Court upheld the trial court’s exercise of discretion in refusing to

declare a mistrial for outbursts in the courtroom where “reasonable minds can differ as to

whether a mistrial should have been declared.” 672 S.W.2d at 163. The Court noted there was

no assurance something similar or worse would not happen on retrial, there was no claim the

prosecution was at fault, and the trial court found the outburst was genuine. Id. To further

bolster a finding that the trial court did not abuse its discretion in denying a mistrial based on

courtroom outbursts, some courts have noted the trial court’s proactive steps to eliminate

prejudice from the outbursts, such as removing a spectator or instructing the jury to disregard an

outburst. See State v. McDowell, 832 S.W.2d 333, 334 (Mo. App. E.D. 1992); State v. Holman,

570 S.W.3d 157, 160-62 (Mo. App. S.D. 2019).

 Here, even though the trial court did not personally hear comments from the gallery,

Defense Counsel’s concerns and the comments heard by the State’s intern were seriously

considered and immediately addressed. The trial court used its best judgment and discretion to

determine whether the jurors had been prejudiced by anything they may have heard outside of

the evidence. To its credit, the trial court took the matter under advisement and consulted with a

colleague before deciding how to respond. Each juror was asked if they heard anything that may

have had an effect on their impression of the case. None of the jurors indicated they even heard

the comments much less any comment had an impact on them. The court thus found the

comments were made, but that “the jurors did not hear those comments,” and denied the motion

for a mistrial. Furthermore, the trial court exercised sound discretion to proactively eliminate

 16
further outbursts by extensively admonishing the spectators in the gallery and warning them that

they would be removed from the courtroom should they continue such conduct. Moreover, when

Defense Counsel notified the trial court later that a spectator was leaning over the railing and

“aggressively staring” at Appellant, the trial court responded by moving that spectator to the

back row. Appellant has failed to show the trial court’s finding is unsupported by the record, or

that the trial court abused its discretion in denying the motion for a mistrial. Appellant’s second

point is denied.

 Point III

 In his third point, Appellant alleges the trial court abused its discretion in denying his

motion to sever his trial from that of Co-Defendant, in that Co-Defendant’s out-of-court

statement to police denying her presence at the scene of the charged offenses was inconsistent

and irreconcilable with Appellant’s defense that he was acting in lawful defense of others,

namely Co-Defendant and Witness, in committing the offenses. Appellant argues the admission

of this non-testifying co-defendant’s out-of-court statement at the joint trial prejudiced him by

incriminating him and refuting his defense. Further, Appellant claims the trial court’s refusal to

grant severance prejudiced him and denied his rights to due process of law and a fair trial, as

guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and

Article I, Sections 10 and 18(a) of the Missouri Constitution. Appellant argues this Court must

reverse and remand for a new trial.

 Prior to trial, Defense Counsel filed a motion to sever Appellant’s case from Co-

Defendant’s case so they could have separate trials. The motion alleged that “[Co-Defendant]

made a statement to police that she was not present for the robbery of [Witness] or the shooting

of [Caston] or [Johnson]” and that “[t]his [was] inconsistent with [Appellant’s] testimony.” The

 17
motion cited Rule 24.06(b)(3) as “mandat[ing] severance if ‘there is an out-of-court statement

that is not admissible against the defendant that would be admissible against other defendants if a

separate trial is not ordered unless the court finds the out-of-court statement can be limited by

eliminating any reference to the defendant.’” The motion also cited Bruton v. United States, 391

U.S. 123 (1968), for the proposition that severance is mandated where one defendant,

unavailable for cross-examination based on his assertion of the Fifth Amendment, makes an

extrajudicial statement implicating his co-defendant. The motion alleged that severance was

mandated because Appellant “would be faced with an incriminating extra-judicial statement

which he could not pursue through the confrontation process . . . .”

 The court denied the motion for severance after a pre-trial hearing, noting, “According to

[Defense Counsel], [Appellant and Co-Defendant] will each argue that they are a victim and not

the perpetrator of the crimes alleged.” The court concluded, “These defenses are not inherently

irreconcilable” in that “[t]he jury would not be forced to infer, from believing [Co-Defendant’s]

defenses, that [Appellant] was necessarily guilty or that both were guilty.” The court found that

“finger-pointing in closing arguments does not evidence irreconcilable defenses requiring

severance.” It found that “[Appellant’s] anticipated defense alone does not rise to the level of a

factual showing of prejudice and does not demonstrate that [Co-Defendant’s] defenses are

mutually antagonistic.” The trial court found that “this Court is confident that a jury instruction

will suffice to cure any possibility of prejudice resulting from [Co-Defendant’s] potentially

accusatory statements.”

 Appellant also filed a motion in limine to “prohibit[] the State from introducing evidence

of [Co-Defendant’s] statement to police. . . . ,” alleging “[Co-Defendant] told police that

[Appellant] set up a drug deal with [Witness] and that “[Co-Defendant] was unconscious during

 18
the alleged robbery and murder due to accidentally ingesting Fentanyl given to her by

[Witness].” The motion alleged that “[Co-Defendant] stated that she did not pull a gun on

[Witness] in this case, and that she was not present for the deaths of [Johnson and Caston].”

Further, “[Co-Defendant’s] statement does not constitute hearsay if introduced against her at

trial, as it represents an admission by a party opponent” but that “[i]t is . . . inadmissible against

[Appellant] . . . .” The motion concluded, “Wherefore, if the Court is unwilling to sever

Defendants in this case, [Appellant] requests that this Honorable Court enters its order in limine

prohibiting the State from introducing or mentioning in any way [Co-Defendant’s] out[-]of[-

]court statements . . . .”

 Co-Defendant’s attorney also moved to join Appellant’s motion to sever the two

defendants “because the defenses are inconsistent” and “irreconcilable.” The trial court denied

Co-Defendant’s motion to sever and stated, “[M]y previous analysis still stands . . . . I still think

this case should be tried jointly. And I do believe that the jury instruction will suffice to clear up

any confusion and give the proper guidance to the jury.”

 In the pre-trial hearing on the motion in limine, Defense Counsel announced, “I believe

we’re in agreement on that, Your Honor.” The State replied, “I don’t plan to offer [Co-

Defendant’s] statement in my case-in-chief,” however, “[t]he only way I would possibly use it

would be to impeach, or—should she testify.” The State noted that “[a]ll she said was [Witness]

showed up, gave [them] drugs, [Appellant] and [Co-Defendant] used the drugs and passed out,

and [they] didn’t commit this crime.” Co-Defendant’s attorney interjected, stating, “That’s not

all she said . . . . She implied a whole lot more.” The prosecutor responded, “Well, that’s all I

would offer.” The trial court ruled, “So, right now I have by consent, unless impeachment.” The

 19
trial court advised the parties, “If somehow we get to the point where [Co-Defendant’s]

statement is at issue, let’s do that outside the hearing of the jury.”

 During trial, when the lead detective, Detective Frichtel, was cross-examined, Co-

Defendant’s attorney elicited that the detective had “the opportunity to talk to [Co-Defendant].”

The attorney asked, “Didn’t she tell you that [Witness] had you twisted?” Without objection, the

detective replied, “I believe she said that at one point in the interview, yes.” Co-Defendant’s

attorney continued, “That [Witness] had you running around? Didn’t she even tell you you’re

smarter than that?” The detective answered, “She made a lot of comments in the interview, yes.”

 During re-direct, the prosecutor asked the detective: “[Co-Defendant’s attorney] had

asked you about your interview with [Co-Defendant]. And isn’t it true that what she ultimately

told you was that the drugs were brought to her by [Witness], sold to her and [Appellant], and

that the two of them used the drugs and passed out, and there had been no robbery, no shooting,

she wasn’t present for anything?” The detective answered without objection, “That’s correct.”

 During re-cross-examination, Co-Defendant’s attorney asked the detective, “[Y]our

impression was—and correct me if I’m wrong—that [Co-Defendant] knew more than what she

was telling you. Right? Wasn’t that your impression?” The detective answered, “Yes.” Co-

Defendant’s attorney asked, “And basically she told you I can’t give you what you want because

I’m not going to put my husband’s life and my children’s life in danger. Isn’t that kind of what

she told you?” The detective answered, “Yes. Something along those lines.” Co-Defendant

waived her right to testify.

 During closing argument, the State said, “[T]he story [Co-Defendant] gave to Detective

Frichtel is equally unbelievable.” The prosecutor recounted Co-Defendant’s statement that “she

 20
and Appellant] used [Witness’s] drugs together and passed out, and there was—they didn’t

witness any robbery, they didn’t witness any murder.” No objection was made.

 Co-Defendant’s attorney responded in closing that “she bought heroin from [Witness],

her [sic] and [Appellant] did the heroin, . . . and they passed out.” Co-Defendant’s attorney

continued, “The cops didn’t believe that . . . And they were pressing her for more information . . .

[a]nd she told them, . . . she said I can’t tell you what you want because I’m not going to put my

husband and my children in jeopardy. And what she did say at the time, what she did tell

Detective Frichtel, was that [Witness] basically has you twisted.” Co-Defendant’s attorney

concluded, “[Co-Defendant] did not participate in the murder of [Johnson and Caston]. She’s

not guilty.”

 Appellant’s motion for a new trial included a claim that the trial court erred in denying

Appellant’s motion for severance because Appellant and Co-Defendant had “irreconcilable

defenses.” Defense Counsel admitted during the hearing on the motion that “the way that the

evidence came out, especially from the defense side in trial, may indicate to the Court that

severance was not necessary, but I do think that perhaps [Appellant’s] decision to take the stand

might have been different had the cases been severed. And I believe the argument in reference to

severance was in the pretrial motions.”

 Standard of Review

 “The decision to sever a joint trial lies within the sound discretion of the trial court.”

State v. Isa, 850 S.W.2d 876, 885 (Mo. banc 1993) (citing State v. Mahurin, 799 S.W.2d 840,

843 (Mo. banc 1990), cert. denied, 502 U.S. 825 (1991)). An appellate court will not disturb that

ruling unless there is an abuse of discretion resulting in prejudice. Id. The defendant on appeal

 21
bears the burden of affirmatively showing that the joint trial prejudiced his right to a fair trial.

State v. Denzmore, 436 S.W.3d 635, 640 (Mo. App. E.D. 2014).

 Analysis

 “Courts traditionally favor joint trials.” Isa, 850 S.W.2d at 885. Joint trials “play a vital

role in the criminal justice system,” Richardson v. Marsh, 481 U.S. 200, 209 (1987), and “serve

the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment

of relative culpability—advantages which sometimes operate to the defendant’s benefit.” Id. at

210. A motion to sever is appropriate only where there is a serious risk of compromise of the

defendant’s rights or the jury’s ability to make a reliable judgment about guilt or innocence. Isa,

850 S.W.2d at 885.

 Rule 24.06 1 and Section 545.880 2 govern the propriety and procedure of severing joint

trials. State v. Kidd, 990 S.W.2d 175, 182 (Mo. App. W.D. 1999). Rule 24.06 states that co-

defendants must be tried separately only if the court finds the probability of prejudice exists

or, inter alia, a separate trial is necessary to a fair determination of whether the defendant is

guilty. Isa, 850 S.W.2d at 884-85; Kidd, 990 S.W.2d at 182. Similarly, Section 545.880.2

requires separate trials only when the trial court finds the “probability for prejudice” to one

defendant in a joint trial. Isa, 850 S.W.2d at 885. Section 545.880.2(4) directs that the trial

court “shall find” the “probability for prejudice” exists if a separate trial of a co-defendant is

necessary to achieve a fair determination of guilt or innocence of any defendant. Id.

 The purpose of severance “is to protect defendants in joint trials from being convicted on

evidence that would be inadmissible against them in a separate trial.” Denzmore, 436 S.W.3d at

640 (quoting State v. Ward, 782 S.W.2d 725, 729 (Mo. App. E.D. 1989)). “Severance is

1
 All rule references are to the Missouri Supreme Court Rules (2020), unless otherwise indicated.
2
 All statutory references are to RSMo (2016) as updated, unless otherwise indicated.

 22
required when the proof is such that a jury could not be expected to compartmentalize the

evidence as it relates to the separate defendants.” State v. Oliver, 791 S.W.2d 782, 786 (Mo.

App. E.D. 1990). Although it is the duty of the trial court to sever the trials of co-defendants if

there are irreconcilable defenses, the doctrine is limited to those cases where the jury will infer

that the conflict alone demonstrated that both are guilty. Id. Severance is not required when a

less drastic course, such as the provision of proper jury instructions, will prevent prejudice to the

defendant. Denzmore, 436 S.W.3d at 640; Isa, 850 S.W.2d at 885; Kidd, 990 S.W.2d at 182.

 Here, Appellant claims Co-Defendant’s out-of-court statement to police denying her

involvement in the charged offenses was inconsistent and irreconcilable with Appellant’s

defense that he was acting in lawful defense of others. Co-Defendant’s statement to police

explained that she and Appellant had used drugs that were delivered by Witness and then they

passed out together, giving them both an alibi for the robbery and shooting. Upon the jury’s

acceptance of Co-Defendant’s defense, the jury would not have been likely to convict Appellant

of the same crimes. Thus, the trial court did not abuse its discretion in denying Appellant’s

motion to sever on the basis that the defenses were irreconcilable.

 Even if the jury disbelieved Co-Defendant’s statement that neither she nor Appellant

were present during the robbery and shooting, her credibility did not reasonably negate

Appellant’s assertion that he shot the two victims because he was defending the others. In fact,

the jury found Co-Defendant not guilty, believing there was not enough evidence to convict her,

but simultaneously found Appellant guilty of the same crimes. The detective believed Co-

Defendant knew more than she was saying and that Co-Defendant also said that Witness had it

“twisted.” In addition, the trial court reasonably decided to take a less drastic course than

severance, as suggested by previous court decisions. See Denzmore, 436 S.W.3d at 640. The

 23
trial court granted Appellant’s motion to exclude Co-Defendant’s statement from evidence as

agreed upon by the parties before trial, unless it was made an issue for impeachment; however,

no objections were made to stop the trial as previously suggested by the court, to review the issue

outside the presence of the jury. The court also instructed the jury that “[it] must give separate

consideration to each defendant,” that “[e]ach of the defendants is entitled to have each or any

count submitted against him or her decided on the evidence and the law which is applicable to

him or her,” and that “[a]ny evidence which was or has been limited to one defendant . . . should

not be considered by [the jury] as to another defendant . . . .” Juries are presumed to follow the

instructions given to them; consequently, the trial court did not abuse its discretion in finding that

severance was not required to ensure Appellant’s right to a fair determination of his guilt. Kidd,

990 S.W.2d at 185.

 Furthermore, as mentioned by Defense Counsel during the discussion about Appellant’s

motion for new trial, it was Co-Defendant’s attorney who first asked about Co-Defendant’s

statement and opened the door to its admission. Appellant made no objection to the testimony at

that time or any other time. Defense Counsel further commented that Appellant’s choice to

testify at trial may have ultimately changed the outcome of the case. The trial court’s ruling

denying Appellant’s request to sever his trial from Co-Defendant did not prejudice Appellant.

His own testimony was sufficient for the jury to find him not credible and therefore guilty of two

counts of murder and two counts of armed criminal action. Appellant’s third point is denied.

 Point IV

 In his fourth and final point, Appellant alleges the trial court erred in overruling his

motion for judgment of acquittal at the close of all of the evidence because the evidence was

insufficient to support his conviction of Counts I and II of murder in the second degree and

 24
Counts II and IV of armed criminal action. Appellant claims the State failed to prove beyond a

reasonable doubt that he had not acted under the influence of sudden passion arising from

adequate cause. Further, Appellant argues the trial court’s error denied his right to due process

of law, as guaranteed by the Fourteenth Amendment to the United States Constitution and

Article I, Section 10 of the Missouri Constitution. Appellant alleges this Court must reverse his

convictions and sentences and discharge him.

 Standard of Review

 In determining whether there is sufficient evidence “to support a conviction and to

withstand a motion for judgment of acquittal, this Court does not weigh the evidence but rather

accepts as true all evidence tending to prove guilt together with all reasonable inferences that

support the verdict, and ignores all contrary evidences and inferences.” State v. Lehman, 617

S.W.3d 843, 846-47 (Mo. banc 2021) (quoting State v. Ess, 453 S.W.3d 196, 206 (Mo. banc

2015)). The issue is “whether the State presented sufficient evidence from which a reasonable

juror could have found [the d]efendant guilty of the crime beyond a reasonable doubt.” State v.

Hall, 561 S.W.3d 449, 452-53 (Mo. App. S.D. 2018). Circumstantial rather than direct evidence

of a fact is sufficient to support a verdict. State v. Grim, 854 S.W.2d 403, 406 (Mo. banc 1993).

However, this Court may not “supply missing evidence or give the state the benefit of

unreasonable, speculative or forced inferences.” Lehman, 617 S.W.3d at 847 (citing State v.

Langdon, 110 S.W.3d 807, 811-12 (Mo. banc 2003)).

 Analysis

 A person commits the crime of second-degree murder if he or she knowingly causes the

death of another person or, with the purpose of causing serious physical injury to another person,

causes the death of another person. Section 565.021.1(1), RSMo Supp. 2017. However, if the

 25
defendant's conduct meets the elements of conventional second-degree murder, but the act is

committed under the influence of sudden passion arising from adequate cause, he would be

guilty of voluntary manslaughter. Section 565.023.1(1), RSMo Supp. 2017; State v. Price, 928

S.W.2d 429, 431 (Mo. App. W.D. 1996).

 “Sudden passion” is defined as “passion directly caused by and arising out of provocation

by the victim or another acting with the victim which passion arises at the time of the offense and

is not solely the result of former provocation[.]” Section 565.002(15). “Adequate cause” is

“cause that would reasonably produce a degree of passion in a person of ordinary temperament

sufficient to substantially impair an ordinary person's capacity for self-control[.]” Section

565.002(1). The offense must have been committed in sudden passion, and not after there has

been time for the passion to cool. State v. Redmond, 937 S.W.2d 205, 208 (Mo. banc 1996);

State v. Fears, 803 S.W.2d 605, 609 (Mo. banc 1991).

 Acting under the influence of sudden passion arising from adequate cause “is a special

negative defense to the crime of conventional second degree murder.” State v. Stidman, 259

S.W.3d 96, 102 (Mo. App. S.D. 2008) (citing State v. Boyd, 913 S.W.2d 838, 842 (Mo. App.

E.D. 1995)). Here, Appellant argues the State failed to prove its burden that he did not act with

sudden passion, but the “Appellant has the burden of injecting this issue.” Boyd, 913 S.W.2d at

842. If the defendant satisfies his burden of injecting the issue of sudden passion, “an instruction

submitting conventional murder in the second degree must submit, as an element of the crime, a

third paragraph that defendant did not do so under the influence of sudden passion arising from

adequate cause.” Id. The trial court also must give a separate, voluntary manslaughter

instruction patterned after MAI–CR 3d 313.08. Id.; Notes on Use 4, MAI–CR 3d 313.04.

 26
 It is not for the court to determine credibility, nor to weigh the evidence in any other

respect. State v. Stepter, 794 S.W.2d 649, 654 (Mo. banc 1990). The court's role is to determine

whether the testimony presented would support a finding that the defendant killed under the

influence of sudden passion arising from adequate cause. Redmond, 937 S.W.2d at 209. A jury

may accept part of a witness's testimony while disbelieving other portions. Id. A jury may also

draw certain inferences from a witness's testimony, but reject others. Id.

 Here, the jury was properly instructed on both conventional second-degree murder and

voluntary manslaughter, and Appellant does not contest the instructions. The jury heard

conflicting evidence from Appellant and Witness, to support each and was tasked with choosing

which evidence to accept, and thus, which crime to match to the evidence. Appellant testified

that both victims, Johnson and Caston, engaged in criminal behavior, threatened the occupants of

Witness’s car with a gun, and kidnapped Witness, Co-Defendant, and Appellant by forcing them

to take a long car ride from St. Louis to Illinois and back. The jury heard the story about their

stop in Illinois where Johnson and Caston made Witness and Co-Defendant participate in an

invasive strip-search of Witness at gunpoint, and returned to St. Louis. The jury heard and

considered Appellant’s testimony that Johnson pointed the gun at Appellant and Caston asked

Johnson if he was “going to handle this,” Caston grabbing Co-Defendant and dragging her over

Witness and out of the car with him. Appellant told the jury that Johnson pointed the gun at him,

Witness screamed from the backseat, and Appellant grabbed the gun from Johnson and shot him.

Appellant continued by running from the car to save Co-Defendant, whom he felt was in danger,

by shooting Caston. Appellant now argues this evidence showed that he shot the two victims by

acting under the influence of sudden passion arising from adequate cause, and the State did not

prove otherwise.

 27
 However, Witness’s testimony told a different story from that given by Appellant.

Witness testified that Co-Defendant produced the gun and pointed it at her shortly after

Appellant sat in Witness’s car for a purported drug deal, and Co-Defendant kept the gun the

entire time in the car. Witness told the jury that neither Johnson nor Caston had a gun, and that

she only saw it again when Appellant got back into the car and used it to shoot Johnson. Witness

also testified that Caston, Co-Defendant, and Appellant all got out of the car together.

 Furthermore, “[a] permissible inference of guilt may be drawn from acts or conduct of an

accused subsequent to an offense if they tend to show a consciousness of guilt by reason of a

desire to conceal the offense or accused’s role therein.” State v. Hibbert, 14 S.W.3d 249, 253

(Mo. App. S.D. 2000). Additional evidence from Appellant supported a finding of second-

degree murder based on Appellant’s consciousness of guilt. Appellant admitted to fleeing from

the murder scene in Witness’s car, throwing the murder weapon away, leaving his apartment to

stay in a hotel with Co-Defendant, and fleeing to Texas to avoid apprehension by police.

 Thus, there was sufficient evidence from which the jury could have reasonably found that

Appellant did not shoot his victims while under the influence of sudden passion arising out of

threats or provocation by the victims. The court did not err when it determined the testimony

presented was sufficient to support a finding that Appellant killed either with or without sudden

passion. The court accordingly instructed the jury on Counts I and III for second-degree murder,

which specifically excluded sudden passion, alternatively for second-degree murder as a result of

perpetrating a robbery, or alternatively for manslaughter. The trial court submitted correlating

instructions on Count III for the death of Caston. Ultimately the jury agreed there was sufficient

evidence to support the finding that Appellant killed without sudden passion when it followed

the instructions on second-degree murder for Counts I and III, including “that [Appellant] did not

 28
do so under the influence of sudden passion arising from adequate cause,” and found Appellant

guilty of the offenses of conventional second-degree murder in Counts I and III and the related

offenses of armed criminal action in Counts II and IV. Instead of accepting Appellant’s

testimony, the jury also heard and believed Witness’s testimony that significantly differed from

Appellant’s.

 The trial court did not err in overruling Appellant’s motion for judgment of acquittal at

the close of all of the evidence because there was sufficient evidence of second-degree murder

presented from which a reasonable juror could find Appellant was not acting under the influence

of sudden passion arising from adequate cause. Appellant’s fourth point is denied.

 CONCLUSION

 The judgment of the trial court is affirmed.

 ____________________________________
 Lisa P. Page, Judge

Robin Ransom, P.J. and
Sherri B. Sullivan, J., concur.

 29